IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

| | | |
|---|---|---|
| BRIAN MARSHALL, | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | No. 5:12-cv-00428-SWW |
| | * | |
| | * | |
| DREW CENTRAL SCHOOL DISTRICT; | * | |
| RENE NOWLES, MIKE PENNINGTON, | * | |
| CURLEY JACKSON, BRANDON | * | |
| SATTERLEE, and MIYOSHI SMITH, | * | |
| individually and in their official capacities | * | |
| as current and former members of the | * | |
| Drew Central School Board; WAYNE | * | |
| FAWCETT, individually and in his official | * | |
| capacity as former Superintendent of | * | |
| Drew Central School District; STEVEN M. | * | |
| NOBLE, individually and in his official | * | |
| capacity as former Principal of Drew | * | |
| Central High School; THEDA FRAN | * | |
| COLBERT, individually and in her official | * | |
| capacity as Bus Driver of Drew Central | * | |
| School District and in her official capacity | * | |
| as Secretary of Drew Central High School; | * | |
| and JOHN DOES A-Z and JANE | * | |
| DOES A-Z, | * | |
| | * | |
| Defendants. | * | |

OPINION AND ORDER

Plaintiff Brian Marshall brings this 42 U.S.C. § 1983 action against the following

defendants: Drew Central School District; Rene Nowles, Mike Pennington, Curley

Jackson, Brandon Satterlee, and Miyoshi Smith, individually and in their official

capacities as current and former members of the Drew Central School Board; Wayne

Fawcett, individually and in his official capacity as former Superintendent of the Drew

Central School District; Steven M. Noble (who is proceeding *pro se*), individually and in his official capacity as former Principal of Drew Central High School; Theda Fran Colbert, individually and in her official capacity as Bus Driver of Drew Central School District and in her official capacity as Secretary of Drew Central High School; and John Does A-Z and Jane Does A-Z.  Marshall alleges defendants interfered with his fundamental parental right to the care, custody, and control of his son, J.B., in violation of the Due Process Clause of the Fourteenth Amendment.  Marshall also asserts state claims pursuant to the Arkansas Civil Rights Act of 1993, interference with parental rights under the Arkansas Constitution, intentional infliction of emotional distress (tort of outrage), and false imprisonment.

Before the Court are the following motions: (1)  motion [doc.#21] by Drew Central School District, Nowles, Pennington, Jackson, Satterlee, Smith, and Fawcett for summary judgment on, *inter alia*, Marshall's Fourteenth Amendment due process claims; (2) motion [doc.#14] by Colbert for summary judgment on Marshall's Fourteenth Amendment due process claims; (3) motion [doc.#16] by Colbert for summary judgment on Marshall's state-law intentional infliction of emotional distress claim; (4) motion [doc.#18] by Colbert to dismiss Marshall's state-law false imprisonment claim for failure to name the real party in interest and, in the alternative, for summary judgment; and (5) motion [doc.#45] by Marshall to strike Colbert's objections to his Fed.R.Civ.P. 26(a)(3) Pretrial Disclosure Sheet.  Responses to the motions for summary judgment and, in most

cases, replies to the responses have been filed.[1]  For the reasons that follow, the Court

grants the motions of Drew Central School District, Nowles, Pennington, Jackson,

Satterlee, Smith, Fawcett, and Colbert for summary judgment on Marshall's Fourteenth

Amendment due process claims, *sua sponte* dismisses with prejudice Marshall's

Fourteenth Amendment due process claims against Noble, dismisses without prejudice

Marshall's state claims pursuant to the Arkansas Civil Rights Act of 1993, interference

with parental rights under the Arkansas Constitution, intentional infliction of emotional

distress, and false imprisonment, and denies as moot Marshall's motion to strike Colbert's

objections to his Fed.R.Civ.P. 26(a)(3) Pretrial Disclosure Sheet.

## I.

In early 2011, J.B., who at all times relevant to this action was a 16-year-old

minor, was living with his mother, Linda Queen Johnson, in Minnesota.  Marshall and

Johnson were minors when J.B. was born and they never married or lived together.

There are no court orders regarding custody or visitation pertaining to J.B.  There

are, however, orders declaring Marshall to be J.B.'s father and ordering him to pay child

support.

---

[1] Because of the failure of Drew Central School District to timely provide discovery to
Marshall, the Court, by order entered May 6, 2014 [doc.#52], gave Marshall up to and including
May 23, 2014, in which to supplement his response to the motion for summary judgment by
Drew Central School District, Nowles, Pennington, Jackson, Satterlee, Smith, and Fawcett
[doc.#21].  Marshall did in fact supplement his response, albeit in an untimely manner as his
supplemental response and accompanying papers [doc.#'s 54-56] were filed near the midnight
hour on May 23, 2014.  See CM/ECF Administrative Policies and Procedures Manual for Civil
Filing, § III.A.3. ("time sensitive filings, which are electronically filed on the last day of any
given deadline, shall be filed by 5:00 p.m., unless otherwise ordered by the Court.").

Marshall states that in early 2011, Johnson called and reported that J.B. was getting into trouble at school and causing problems at home to the point that she was on the verge of putting him out of the house.  Marshall states that he, his wife Tiffany, and Johnson agreed that J.B. would be sent to Arkansas to live with Marshall and Tiffany in Drew County, Arkansas, and that there was no intention of J.B. returning to Minnesota. Prior to that time, J.B. had never lived with Marshall.

Having made the decision to send J.B. to Arkansas, Johnson wrote a note giving Marshall permission to enroll J.B. in school and get him the appropriate health care. Upon J.B.'s arrival in Arkansas, Marshall and Tiffany enrolled J.B. in the Drew Central High School.[2]

On November 11, 2011, J.B. was disciplined by the school for "disruptive behavior," namely "cutting a chunk out of classmates['] hair with scissors."  J.B. was placed on "In School Suspension" beginning November 14, 2011, and sent to "Alternative School."

During the 2011-2012 school year, Colbert worked as a secretary for Noble, then-principal of Drew Central High School, and also drove a school bus.  Colbert states that on November 15, 2011, J.B. came to school with "bruises on his arms and one bruise that was in the shape of a belt buckle.  His hair had also been cut out randomly in various places."  Colbert states that by the time she got to the office that morning, Noble was

---

[2] Marshall states that in August 2011, he had his child support obligations terminated as he now had custody of J.B.

already on the phone with Johnson.  Colbert states that "J.B. informed us that his father

had done all this and that he was not going to go back home.  He was scared."  Marshall

states he does not know whether J.B. made any allegations of abuse to the school but does

agree with Colbert that J.B. appeared at school with clothes in a backpack.

Marshall does not dispute that he cut a portion of J.B.'s hair because of the

disruption J.B. caused at the school and that there was at least one bruise on J.B.'s body.

In this respect, Marshall submits an affidavit of one of J.B.'s classmates, B.T., in which

B.T. states that J.B. came to school on November 15, 2011, and that J.B.'s hair was

"messed up" and that he "had a bruise on his arm.  I think it was his right one.  It did not

look that bad to me and I did not see any other bruises on him."[3]  Likewise, Tiffany states

in an affidavit that Marshall called Johnson in Minnesota and told her he was going to

"whip" J.B. for what he had done and that Johnson agreed to this course of action.

Tiffany states that Marshall "cut J.B.'s hair to show him how it felt to have somebody cut

a plug out of his hair" and that Marshall "whipped J.B. that night.  He used a belt and

whipped him on the behind.  It was not excessive."[4]

Colbert states that during the conversation on the morning of November 15, 2011,

Johnson "decided that J.B. needed to come back home to live with her."  Colbert states

---

[3] The basis of Marshall's assertion in his statement of material facts not in dispute that
there were no bruises on J.B.'s arms is not clear given Marshall's submission of B.T.'s affidavit
confirming that he saw a bruise on J.B.'s arm.

[4] Marshall did not submit an affidavit describing his actions and Tiffany does not state
that she witnessed the whipping.

that she spoke with Johnson after J.B. had spoken with her and that Johnson "wanted to know if I could keep him overnight and said she had custody." Colbert states, and Marshall agrees, that she checked J.B.'s file to confirm what Johnson had told her–that she was J.B.'s legal custodian–and she states she located a number of documents that seemed to confirm this, including a handwritten note from Johnson giving Marshall permission to enroll him, a school record from Minnesota listing Johnson as his contact, and a record regarding Johnson's application for government housing requesting confirmation of J.B.'s enrollment in school in Arkansas. Marshall, however, states that he, not Johnson, was the legal custodian of J.B., that none of the documents in J.B.'s file that Colbert references were sufficient to confirm that Johnson was the legal custodian, and that he and Tiffany were listed as the contacts for J.B. at Drew Central High School. In any case, Colbert states that after reviewing J.B.'s file, she informed Johnson that she would be glad to let J.B. stay with her that evening (which Marshall notes was not a licensed or approved foster home or shelter). Colbert states that Johnson purchased a bus ticket for J.B. to return home the next day and provided them with the ticket information and time of departure. Marshall agrees that Colbert waited for Johnson to confirm whether she could get a ticket for J.B. to return to Minnesota and he does not dispute that Johnson desired that J.B. return to Minnesota.[5]

---

[5] Marshall has not submitted an affidavit of Johnson and he apparently did not depose Johnson–he certainly has not submitted any deposition testimony of Johnson in response to defendants' motions for summary judgment.

J.B. stayed in school the entire day on November 15, 2011, but did not return to Marshall and Tiffany's home at the end of the school day.  Rather, J.B. rode on Colbert's bus on a route that did not include the Marshalls' home and returned to the school at the end of the route.  Colbert then drove J.B. to her home.

In the meantime, Noble states in his *pro se* answer to Marshall's complaint that before leaving school for the day on November 15, 2011, he called the Arkansas Department of Human Services (DHS) hotline to report J.B.'s allegations of abuse.[6] Marshall claims that as employees of the Drew Central School District, Noble and Colbert were "mandated reporters" requiring them to call the DHS hotline immediately upon suspecting abuse or becoming aware of abuse, and that their delay in contacting DHS prevented DHS from beginning its investigation.

When J.B. did not return home from school on November 15, 2011, Tiffany states that she and Marshall became worried and commenced a search for J.B.  She states that when they were unable to locate him, they called the Drew County Sheriff's Office to report J.B. missing.  In attempting to locate J.B., Tiffany states she and Marshall called Colbert and that Colbert twice denied knowing anything about J.B.'s whereabouts.

Deputy Sheriff David Wesson investigated the missing person report on J.B. Wesson's investigation led him to Colbert who initially denied knowing where J.B. was

---

[6] On December 28, 2012, Noble filed a hand-written letter explaining his version of the events.  This letter, which referenced the case number but, contrary to the requirement of Fed.R.Civ.P. 10, had no caption, was understandably docketed by the Clerk as Noble's answer to the complaint.

but later admitted that she knew his location.  Colbert acknowledges that when Wesson

came to her door late on the evening of November 15, 2011, she initially did not tell

Wesson that J.B. was with her because she "was fearful that J.B. would be taken back to

his father and hurt again."  Colbert states that when Wesson explained why it was

important that she tell him what she knew, she let Wesson know of the allegations of

abuse, that Johnson had decided J.B. needed to come back home, that Johnson asked if

J.B. could stay with her for the night, and that Johnson had arranged for J.B. to return

home by bus in the morning.  Wesson states he left without getting J.B. because Colbert

said that DHS had told her to keep J.B. with her.  DHS investigator Jewel McCoy, who

investigated Noble's call to the DHS hotline regarding J.B.'s allegations of abuse, denies

that she ever authorized anyone to remove J.B. from Marshall's home.  In any case,

Wesson called Marshall and Tiffany to let them know what he found through his

investigation.

On the morning of November 16, 2011, McCoy states she went to J.B.'s school to

begin her investigation and that she encountered Marshall and Tiffany looking for J.B.[7]

She states that she, Marshall, and Tiffany learned that J.B. had been taken to Pine Bluff,

Arkansas, to catch a bus to leave the state.  In fact, on that same morning, Noble met up

with J.B. and drove him to the Greyhound bus station in Pine Bluff to return to Johnson in

---

[7] McCoy states that she later completed her investigation of the claim of abuse against
J.B. and determined it was "[u]nsubstantiated."  She states that being "disciplined" with a belt "is
not 'abuse' so long as it is used to correct the child.  Sometimes it leaves marks on the child, but
if they are minor, then that is permissible."

Minnesota.  J.B., with a cell phone provided by Colbert, made it safely home to Minnesota where Tiffany states that J.B.'s behavioral problems resumed, Johnson put him out of the house, and J.B. did not finish the school year.

Marshall claims that at no time did any official from the Drew Central School District contact him or Tiffany concerning these events, either to initiate an investigation of the alleged abuse allegations or to obtain consent to remove J.B. from Arkansas.  He states that after J.B. had boarded the bus for Minnesota, he and Tiffany met with Fawcett in his office and that "[d]uring the meeting, Superintendent Fawcett made light of the situation when he chuckled and stated, 'We made a mistake.  But we can all learn from this.'"[8]

## II.

The Court first turns to the motions of Drew Central School District, Nowles, Pennington, Jackson, Satterlee, Smith, Fawcett, and Colbert for summary judgment on

---

[8] Fawcett states that he did not participate in the decision to not return J.B. to Marshall's home and to remove him to Minnesota and that he did not know about that decision until the day he left.  Marshall submits an unsworn statement from Melissa Vincent (which Marshall states was provided by Drew Central School District in response to a request for production of documents) in which she states that on November 15, 2011, after phone calls with J.B.'s mother had taken place and the day before J.B. left for Minnesota, a meeting occurred between Fawcett, Noble, and herself.  Vincent (who, according to Marshall, was then-assistant high school principal) states that at the meeting, Noble shared with Fawcett what had happened concerning J.B.'s bruises and "bad haircut" and that Fawcett told Noble to call the DHS hotline.  Vincent states it was her understanding that J.B. would be taken into DHS custody.  She does not allege that Fawcett participated in the decision to not return J.B. to Marshall's home and to remove him to Minnesota and she does not allege that Fawcett knew about that decision before the day J.B. left for Minnesota.  Marshall, however, states that it is "logical to infer" that the issue was discussed in the meeting and that Fawcett took part in the decision to not return J.B. to Marshall's home and to remove him to Minnesota.

Marshall's Fourteenth Amendment due process claims.  Separate defendants argue there are no genuine issues of material fact with respect to these claims and that they are entitled to summary judgment as a matter of law.

A.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," or show "that the materials cited do not establish the absence or presence of a genuine dispute," or "that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider other materials in the record." Fed.R.Civ.P. 56(c)(3).  The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (citations omitted).  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation and quotation marks omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

### B.

### 1.

As an initial matter, the Court grants summary judgment to Drew Central School District on Marshall's Fourteenth Amendment due process claims as "[i]t is well settled that a municipality may not be found liable under § 1983 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Lee v. Pine Bluff School District*, 472 F.3d 1026, 1029 (8th Cir. 2007) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). "A school district cannot be held liable under § 1983 on a *respondeat superior* theory, *i.e.,* simply because it employs a tortfeasor." *Id.* at 1029-30. Marshall alleges no unconstitutional policy of the Drew Central School District, and he asserts no widespread unconstitutional practices that might constitute a "'custom or usage with the force of law.'" See *id*. at 1030 (quoting *McMillian v. Monroe County*, 520 U.S. 781, 796 (1997)). Accordingly, the Court grants summary judgment to Drew Central School District on Marshall's Fourteenth Amendment due process claims against the school district.

### 2.

In addition, the Court grants summary judgment to Nowles, Pennington, Jackson, Satterlee, and Smith on Marshall's Fourteenth Amendment due process claims as there is no allegation that these defendants had any participation, or even knowledge, of the

factual allegations which form the basis of this action.  Marshall may not impose liability

against these defendants through *respondeat superior*.  See *Keeper v. King*, 130 F.3d

1309, 1314 (8th Cir. 1997) (noting it is well settled that *respondeat superior* is not a basis

for liability under 42 U.S.C. § 1983).

3.

Nowles, Pennington, Jackson, Satterlee, Smith, Fawcett, and Colbert also move for

summary judgment on Marshall's Fourteenth Amendment due process claims on grounds

that Marshall does not have a clearly established constitutional right of which a

reasonable person would have known and that they are thus entitled to qualified

immunity.  The Court agrees.

"Qualified immunity shields a government official from liability and the burdens

of litigation unless his [or her] conduct violates 'clearly established statutory or

constitutional rights of which a reasonable person would have known.'"  *Loch v. City of

Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800,

818 (1982)).  To overcome a claim of qualified immunity, the plaintiff must assert a

violation of a clearly established constitutional right, that right must have been clearly

established at the time of the violation, and, given the facts most favorable to plaintiff,

there must be no genuine issues of material fact as to whether a reasonable official would

have known that the alleged action indeed violated that right.  *Gregoire v. Class*, 236 F.3d

413, 417 (8th Cir. 2000) (citation and quotation marks omitted).  Officials are not liable

for bad guesses in gray areas; they are liable for transgressing bright lines.  *Luckert v.*

*Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012) (citation and quotation marks omitted). "Qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Id*. (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

It is well settled that "'the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.'" *Slaven v. Engstrom*, 710 F.3d 772, 779 (8th Cir. 2013) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion)). However, "'[t]hat liberty interest is limited by the compelling governmental interest in protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" *Id*. (quoting *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997)). The net result of these competing interests is that the Court must weigh the interests of the state and child against those of the parents to determine whether a constitutional violation has occurred. *Abdouch v. Burger*, 426 F.3d 982, 987 (8th Cir. 2005). "Under this balancing test, the officials' actions must have been based on a reasonable suspicion of abuse and must not have been disproportionate under the circumstances." *Id*. (citation omitted). "'The need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and state makes the qualified immunity defense difficult to overcome.'" *Id*. (quoting *Manzano v. South Dakota Dept. of Soc. Servs.*, 60 F.3d 505, 510 (8th Cir. 1995)). "Even where this balancing reveals a

constitutional violation, qualified immunity still applies unless the constitutional violation was so clear that an objectively reasonable official under the circumstances would have recognized the disproportionality or lack of reasonable suspicion." *Id.*

The Court has carefully considered the matter and determines that even assuming a constitutional violation occurred (and the Court makes no such finding), the constitutional violation was not so clear that an objectively reasonable official under the circumstances would have recognized the disproportionality or lack of reasonable suspicion. Colbert and Noble were faced with a situation in which J.B. appeared at school with a portion of his hair cut out and at least one bruise on his arm that J.B. claims Marshall caused. J.B. had packed extra clothes intending not to return home, and Marshall does not dispute that J.B.'s mother requested that J.B. stay with Colbert for the night and purchased a bus ticket for his return to Minnesota. In light of the facts known to Colbert and Noble at the time, the Court cannot say it was unreasonable for these defendants to conclude that J.B.'s welfare would be threatened if he were returned to Marshall's home against J.B.'s and his mother's will.

Marshall claims Johnson did not have custody of J.B. and that any consent she gave for J.B. to stay at Colbert's home was invalid. But at a minimum, the competing interests of unmarried parents with differing legal rights and entitlements to the custody, care and control of their child weighed against the rights of the state and the child in circumstances in which child abuse is reasonably suspected makes this an amorphous constitutional issue that precludes a finding that there was a clearly established right. See

*K.D. v. County of Crow Wing*, 434 F.3d 1051, 1056 (8th Cir. 2006) ("We have repeatedly held that when a state official takes an action that would otherwise disrupt familial integrity he or she is entitled to qualified immunity if the action is properly founded upon a reasonable suspicion of child abuse.").  Accordingly, Nowles, Pennington, Jackson, Satterlee, Smith, Fawcett, and Colbert are entitled to qualified immunity on Marshall's Fourteenth Amendment due process claims.

4.

Although *pro se* defendant Noble has not moved for summary judgment or otherwise participated in the defense of this action since he filed his answer, the time for conducting discovery has expired and the factual record as developed establishes that he is entitled to qualified immunity for the reasons just stated.  Accordingly, the Court *sua sponte* dismisses with prejudice Marshall's Fourteenth Amendment due process claims against Noble.  See *Williams v. Borough of Sharon Hill*, Civil Action No. 12-5395, 2013 WL 4743471, *7 (E.D. Pa. Sept. 04, 2013) ("While defendants do not raise the issue of qualified immunity in their motion to dismiss, the Court may address this defense *sua sponte*, when appropriate."); *Dampier v. Donaglia*, No. C05-1954-MJP-MJB, 2007 WL 2253403, *5 (W.D. Wash. Aug. 02, 2007) ("considerations of judicial economy dictate that this Court dismiss Plaintiff's First Amendment claims *sua sponte* on the grounds that Defendants are entitled to qualified immunity."); *Alexander v. Tangipahoa Parish Sheriff Dept.*, Civil Action No. 05-2423, 2006 WL 4017825, *6 (E.D. La. Oct. 02, 2006) ("Qualified immunity is an issue of law.  The court may dismiss the complaint *sua sponte*

based on a finding that defendants are entitled to qualified immunity, either because the complaint presents a purely legal question or when it depends on the factual record, if the factual record has been developed adequately.").

## III.

As for Marshall's state claims, the United States Court of Appeals for the Eighth Circuit has held that when federal and state claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law as a matter of comity. *American Civil Liberties Union v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (citation omitted).  See also *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009) ("[i]t is within the district court's discretion to exercise supplemental jurisdiction after dismissal of the federal claim" but "[w]here, as here, resolution of the remaining claims depends solely on a determination of state law, the Court should decline to exercise jurisdiction."); *Figg v. Russell*, 433 F.3d 593, 600 (8th Cir. 2006) (noting that when district court dismissed federal 42 U.S.C. § 1983 action, it should have exercised its discretion to dismiss state-law claims without prejudice, leaving it to plaintiff to determine whether to reassert them in state court).  Accordingly, the Court dismisses without prejudice Marshall's state claims pursuant to the Arkansas Civil Rights Act of 1993, interference with parental rights under the Arkansas Constitution, intentional infliction of emotional distress, and false imprisonment.

## IV.

Because the Court has today dismissed with prejudice Marshall's federal claims and dismissed without prejudice his state claims, Marshall's motion to strike Colbert's objections to his Fed.R.Civ.P. 26(a)(3) Pretrial Disclosure Sheet is denied as moot.

V.

For the foregoing reasons, the Court grants the motion of Drew Central School District, Rene Nowles, Mike Pennington, Curley Jackson, Brandon Satterlee, Miyoshi Smith, and Wayne Fawcett for summary judgment [doc.#21] on Brian Marshall's Fourteenth Amendment due process claims, grants Theda Fran Colbert's motion for summary judgment [doc.#14] on Brian Marshall's Fourteenth Amendment due process claims, *sua sponte* dismisses with prejudice Brian Marshall's Fourteenth Amendment due process claims against Steven M. Noble, dismisses without prejudice Brian Marshall's state claims pursuant to the Arkansas Civil Rights Act of 1993, interference with parental rights under the Arkansas Constitution, intentional infliction of emotional distress, and false imprisonment,[9] and denies as moot Brian Marshall's motion [doc.#45] to strike Theda Fran Colbert's objections to his Fed.R.Civ.P. 26(a)(3) Pretrial Disclosure Sheet. The Court will enter judgment accordingly.[10]

---

[9] Thus, the motion [doc.#16] by Colbert for summary judgment on Marshall's state-law intentional infliction of emotional distress claim and the motion [doc.#18] by Colbert to dismiss Marshall's state-law false imprisonment claim for failure to name the real party in interest and, in the alternative, for summary judgment are both denied without prejudice.

[10] Marshall has not identified any John or Jane Doe defendant for inclusion in this action and the time for doing so has passed.

IT IS SO ORDERED this 3rd day of June 2014.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE